**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

CHONTE M. T., *on behalf of* Z.A.S., Jr. *(a minor)*,[1]

                                        Plaintiff,             5:21-cv-550 (BKS)

v.

KILOLO KIJAKAZI,[2] Acting Commissioner of Social
Security,

                                         Defendant.

---

**Appearances:**

*For Plaintiff:*
Howard D. Olinsky
Olinsky Law Group
250 South Clinton Street, Suite 210
Syracuse, NY 13202

*For Defendant:*
Carla B. Freedman
United States Attorney
Amy C. Bland
Special Assistant United States Attorney
Social Security Administration
J.F.K. Federal Building, Room 625
Boston, MA 02203

---

[1] In accordance with the local practice of this Court, the Court has abbreviated Plaintiff's last name as well as the name of the minor on whose behalf Plaintiff brings this action.

[2] Pursuant to Fed. R. Civ. P. 25(d), the current Acting Commissioner of Social Security, Kilolo Kijakazi, has been substituted in place of her predecessor, Commissioner Andrew Saul.

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Plaintiff Chonte M. T., as mother, filed this action on behalf of Claimant Z.A.S., Jr., a minor, under 42 U.S.C. § 405(g) seeking review of a decision by the Commissioner of Social Security (the "Commissioner") denying Claimant's application for Social Security Income ("SSI") benefits. (Dkt. No. 1). The parties' briefs, filed in accordance with N.D.N.Y. General Order 18, are presently before the Court. (Dkt. Nos. 13, 18). After carefully reviewing the Administrative Record[3] and considering the parties' arguments, the Court reverses the Commissioner's decision and remands this matter for further proceedings.

## II.    BACKGROUND

### A.    Procedural History

Plaintiff protectively filed an application for SSI benefits on Claimant's behalf on April 12, 2017, alleging a disability onset of December 13, 2016. (R. 133–41). The claim was denied initially on May 11, 2017, and a hearing was held before Administrative Law Judge ("ALJ") Robyn L. Hoffman on March 8, 2019. (R. 30–58, 81). On July 30, 2019, the ALJ issued a decision finding that Claimant was not disabled within the meaning of the Social Security Act. (R. 10–25). Plaintiff filed a request for review of that decision with the Appeals Council which, on March 8, 2021, denied the request for review. (R. 1–6). Plaintiff commenced this action on May 12, 2021. (Dkt. No. 1).

---

[3] The Court cites to the Bates numbering in the Administrative Record, (Dkt. No. 10), as "R." throughout this opinion, rather than to the page numbers assigned by the CM/ECF system.

### B.   Claimant's Background and Plaintiff's Hearing Testimony[4]

Claimant was approximately 26.5 months old at the time of the March 8, 2019 hearing, at which Plaintiff testified. (R. 30–58). Claimant lived at home with his mother and infant baby sister. (R. 55). Plaintiff testified that Claimant was diagnosed with Dandy-Walker syndrome, which results in "some developmental delays." (R. 39). Claimant also has a septal defect which was expected to close up. (R. 44).

Claimant started rolling over when he was 7 or 8 months old, crawling when he was 14 months old, and walking when he was 22 months old. (R. 40, 46). He can say "three or four words," such as "mama" and "dada." (R. 40). Plaintiff testified that Claimant sometimes follows an object with his eyes, turns his head if he hears a sound, laughs, and had no delays smiling or responding to his mother's voice. (R. 44–45). Claimant can feed himself finger foods but has difficulty using a spoon. (R. 49–50). Claimant will respond to commands to "stop" or "come here" but otherwise does not understand commands. (R. 50). He does not wave goodbye, shake or nod his head, or point at things he wants. (R. 50–51). Plaintiff testified that Claimant grunts and babbles but cannot express what he wants or needs. (R. 51–52). Claimant can toss a ball, turn pages of a book, and crawl up stairs, but he does not stack blocks or play games such as peek-a-boo. (R. 53).

### C.   Medical Evidence

Claimant was born in December 2016, and a cranial sonogram showed a "Dandy-Walker malformation with a partial absence of the corpus callosum." (R. 204–05, 226). After an echocardiogram, Claimant was also diagnosed with small-to-moderate apical muscular ventricular septal defect, (R. 227–28), and a small left preauricular pit, (R. 234). In the first

---

[4] The Court limits its recitation of the record evidence to those facts relevant to its review.

weeks of Claimant's life, his pediatrician noted that he had normal development. (*E.g.*, R. 235 (noting a healthy 6-day-old male infant "with normal growth and development"), 237–38 (noting at 3 weeks old that Claimant alerted to voices and had "normal growth and development"), 243 (noting at 4 weeks old that Claimant had "normal growth and development" but had "[p]ossible syndrome facial features"), 245 (noting at 8 weeks old that Claimant cooed and socially smiled)). On February 28, 2017, Plaintiff reported that Claimant's arms had "increased tone and always appear[ed] to be in flexed position." (R. 249). In March 2017, Claimant had a brain MRI which revealed findings consistent with Dandy-Walker malformation and dysgenesis of the corpus callosum. (R. 324). Claimant was unable to hold his head up. (R. 323).

At his one-year wellness visit in December 2017, Claimant was reported to say "mama" and "dada" and "1–3 additional words," follow one-step command with a gesture, and self-feed. (R. 299–300). He did not point, cruise, or stand alone. (*Id.*). The pediatrician noted that claimant was doing "quite well overall" but had not "reached a few milestones." (R. 301). On February 28, 2018, Claimant's head circumference was noted to have increased more than 3 percentiles, which was "concerning" due to his diagnosis of Dandy-Walker and his "developmental delay." (R. 293). He was referred to early intervention. (*Id.*).

On November 5, 2018, Dr. Ai Sakonju conducted a neurological evaluation of Plaintiff. (R. 279–82). Dr. Sakonju noted that Claimant "walked delayed at 20 months," could not run or throw a ball, had a speech delay and did not put two words together, had no hearing or vision loss, and played with cars and "light up and sound-making toys." (R. 279). Claimant could not drink from a sippy cup. (*Id.*). The physical examination was "notable for joint laxity, some hyperactivity, speech delay, hypotonia and hypotonic gait (walks on inside of feet, with poor leg lift)." (R. 281).

4

### D.    Evaluation Evidence

#### 1.    April 4, 2018 Core Evaluation

On April 4, 2018, Claimant underwent an Early Intervention Core Evaluation through the Children's Therapy Network. (R. 356–61). Claimant was 15.5 months old and was assessed by physical therapist Kristen M. Kelsen, DPT and special education teacher Brian McNally, MST. (*Id.*). To assess Claimant, Ms. Kelsen and Mr. McNally used the Developmental Assessment of Young Children-2 ("DAYC-2"), each subtest of which has an average score of 100 and a normal score range of 90–110, and the Bayley Scales of Infant Development – Third Edition ("BSID-III"), for which standard scores ranging from 85 to 115 are considered to be within normal limits. (R. 357).

Claimant received a score of 72 on the adaptive subtest of the DAYC-2. (R. 357–38). Ms. Kelsen and Mr. McNally noted that Claimant did not sleep through the night consistently, enjoyed bath time, did not fuss when he had a messy diaper, could self-feed finger foods, had difficulty swallowing water, and was able to pull off his own socks. (R. 357).

With regard to Claimant's cognitive development, the assessors noted that Claimant was interested in "exploring and manipulating toys," was able to pour blocks from one cup to another, squeezed a squeak toy, could remove the lid from a plastic bottle to gain access to a cheerio but was unable to problem solve in other tasks, and did not demonstrate "relational play skills." (R. 358). Claimant achieved a standard score of 80 on the BSID-III cognitive development subtest, a score more than one standard deviation below the mean. (R. 358).

Ms. Kelsen and Mr. McNally noted that Claimant is able to communicate his wants and needs "by laughing, smiling, and crying." (*Id.*). He uses some gestures, such as to ask for a drink and say "bye," and "explor[es] sound production by babbling and vocalizations." (*Id.*). Claimant was "not yet using words or following spoken directio[n]s" or pointing. (*Id.*). On the DAYC-2

test, Claimant achieved a receptive language score of 80, an expressive language score of 95, and a total language score of 87, which is slightly outside the normal range for his age. (*Id.*).

With regard to Claimant's physical development, Ms. Kelsen and Mr. McNally first noted that Claimant was easily able to sit without support while manipulating toys, and he could maintain his head in midline. (R. 359). He could turn his head to both sides to visually follow an object. (*Id.*). He could transition from his stomach to a hands and knees position and move from a seated position to hands and knees. (*Id.*). He easily crawled, but his "movement is not smooth and he maintains his elbows locked into extension d[u]e to difficulty with graded control of his upper extremities." (*Id.*). Claimant was "unable to pull up to stand" or "easily support his own weight in standing," although he could stand with assistance with his knees "locked into extension due to muscle weakness." (*Id.*). With regard to his fine motor skills, Claimant could pick up a block "with his thumb opposed to his fingers" and transfer a toy from hand to hand while sitting. (*Id.*). He could "rake a small pellet of food into his hand and pick it up with his thumb opposed to his fingers," using his third finger rather than his index finger. (R. 359–60). Claimant also demonstrated difficulty with "postural control and stability when reaching for a toy in sitting." (R. 360). On the BSID-III, Claimant achieved a total motor standard score of 58, more than two standard deviations below the mean. (*Id.*).

Claimant demonstrated average social and emotional skills, achieving a score of 104 on this DAYC-2 subtest. (R. 359). Ms. Kelsen and Mr. McNally recommended a supplemental feeding evaluation and physical therapy services. (R. 361).

### 2.    September 4, 2018 Core Evaluation

Ms. Nelsen and Mr. McNally evaluated Claimant again on September 4, 2018, when Claimant was 20.5 months old. (R. 350–55). Claimant received a score of 81 on the DAYC-2

adaptive subtest. (R. 351). It was noted that Claimant was sleeping through the night consistently, but still not fussing when he had a messy diaper. (*Id.*).

With regard to Claimant's cognitive development, the assessors noted that Claimant was alert, active, and interested in pursuing and playing with toys. (R. 352). Claimant was able to problem solve by reaching under the open side of a clear box to retrieve cheerios, and he demonstrated an awareness of object permanence. (*Id.*). He was unable to remove the lid from a small plastic bottle and did not show interest in exploring a peg board or puzzle. (*Id.*). He achieved a standard score of 70 on the BSID-III cognitive subtest, two standard deviations below the mean. (*Id.*).

Ms. Kelsen and Mr. McNally noted that Claimant was using some repetitive consonant-vowel blends to make "word approximations" such as "mama" and "dada" and that he used some "to consistently label family members." (*Id.*). He made babbling and cooing sounds and "will change the intonation and pitch of these noises to mimic grammatical patterns." (*Id.*). He followed simple, direct commands such as "no." (*Id.*). However, he did not point or gesture in response to "where" questions and was "not yet talking in identifiable words." (*Id.*). On the DAYC-2 test, Claimant achieved a receptive language score of 77, an expressive language score of 81, and a total language score of 79, which is below average for his age. (*Id.*).

With regard to Claimant's physical development, Ms. Kelsen and Mr. McNally noted that Claimant was able to pull himself up to standing using furniture by transitioning through a half-kneeling position. (R. 353). While he could stand independently, he "inconsistently lowers to the ground with control of his lower extremities." (*Id.*). Claimant could walk assisted and propelled himself forward leading with the pelvis, using a toe-walking position with both knees locked into extension and his lower back arched. (*Id.*). He used a Pincer grasp to pick up a small piece of

food and was able to turn pages in a book. (R. 354). Claimant was unable to make a mark on paper with a crayon held in a Palmer grasp or stack two blocks on top of each other. (*Id.*). Claimant presented with low muscle tone throughout his body and had some postural and balance difficulties. (*Id.*). On the BSID-III, Claimant achieved a total motor standard score of 61, more than two standard deviations below the mean. (*Id.*).

Claimant demonstrated average social and emotional skills, achieving a score of 91 on this DAYC-2 subtest. (R. 353). Ms. Kelsen and Mr. McNally recommended physical therapy services and special instruction services to address aggressive behaviors and "delays in the cognitive and language domains of development." (R. 355).

### 3.    May 24, 2019 Consultative Examination

On May 24, 2019, Kalyani Ganesh, M.D. conducted a consultative examination of Claimant, who was 29 months old. (R. 369–72). Plaintiff reported to Dr. Ganesh that Claimant started walking at 22 months; his balance is off; he just started running, but awkwardly; he only uses monosyllables; he can point and follow instructions; he can climb onto chairs, throw an object, and finger feed himself; he cannot use a fork or spoon; and he can squat and erect to a standing position. (R. 369). Dr. Ganesh noted that Claimant's general appearance, behavior, and gross motor skills were all "normal for age" and that his language skills were "just nonword sounds." (R. 370). She found Claimant's fine motor activity of hands, as well as his strength and fisting in both hands, to be "age appropriate." (R. 371). Overall, Dr. Ganesh opined that Claimant's physical development was "normal," that his speech was "just monosyllables, single words," and that his activities were "moderately impaired." (R. 372).

### 4.    May 30, 2019 Speech Therapy and Occupational Therapy Evaluations

On May 30, 2019, at age 29 months, Claimant underwent a speech therapy evaluation and an occupational therapy evaluation through the Onondaga County Thrive By 5 program. (R.

188–96). Speech-language pathologist Kimberly Campbell, M.S., CCC-SLP performed the speech therapy evaluation and used the Preschool Language Scale – Fifth Edition ("PLS-5") standardized testing tool, which has a mean standard score of 100 with a standard deviation of +/- 15. (R. 188–89). Ms. Campbell noted that Claimant preferred to engage with his own toys and "made very few purposeful interactions with novel people (and toys)." (R. 189). He did not participate in turn-taking games using appropriate eye contact and presented with poor attention to task and reduced participation. (*Id.*).

Claimant demonstrated "solid skills through the 6 to 8-month age range" and "scattered skills" through the 9- to 11-month and 12- to 17-month age ranges on receptive language skills. (*Id.*). Claimant "anticipates simple movements or actions modeled during turn-taking games" but does not consistently respond to commands. (*Id.*). He briefly looks at things his caregiver points to and names, and "responds to an inhibitory word," but he "does not display solid understanding of specific words or phrases without use of gestural cues, physical assistance, and/or prompting." (*Id.*). Claimant did not exhibit "at least one instance of functional or relational play." (*Id.*). Claimant achieved a standard score of 50 on the PLS-5 receptive language subtest, representing a score more than three standard deviations below the mean and "significantly below age-level expectations." (R. 190). Claimant demonstrated "scattered skills through the 12 to 17-month age range" on expressive language skills. (*Id.*). While Claimant vocalizes "at least two different consonant sounds in connected speech," he did not "take turns vocalizing" with a caregiver or "babble two syllables together in spontaneous speech." (*Id.*). He did not "produce any meaningful words consistently to request or label familiar objects" or use "representational" gestures, such as waving or clapping. (*Id.*). Claimant achieved a standard score of 54 on the PLS-5 expressive language subtest, more than three standard deviations below the mean. (*Id.*). He

achieved a total language score of 50, which is "3.3 standard deviations below the mean" for his age group and which corresponds to a "significant" communication delay. (*Id.*).

Overall, Ms. Campbell recommended speech therapy services to assist Claimant and his family "address delays identified in the areas of auditory comprehension, functional communication, play, imitation . . . , vocabulary development, oral-motor skill development, joint attention, turn-taking, transitioning[,] and to decrease frustration resulting from communication delays." (R. 191–92).

Occupational therapist Angela McGlaughlin, OTR/L performed the occupational therapy evaluation of Claimant, using the DAYC-2, the Infant/Toddler Symptom Checklist, and the Peabody Development Motor Scales – 2nd Edition ("PDMS-2"). (R. 193). With regard to Claimant's adaptive behavior, Ms. McGlaughlin noted that Claimant finger feeds himself and will "overstuff" his mouth; he uses a sippy cup but not a straw or regular cup; he enjoys baths but does not help with washing up and does not like his face washed; he is able to remove his socks and pants; he does not notice if he has a messy diaper; and he sleeps through the night. (R. 194). Claimant achieved a score of 70 on the DAYC-2 adaptive skills subtest, two standard deviations below the mean. (*Id.*).

With regard to Claimant's fine motor skills, Ms. McGlaughlin noted that Claimant demonstrated "a mature three-jaw chuck grasp" to pick up a cube, threw blocks but did not attempt to stack them, and demonstrated a "raking grasp" to pick up a bead and place it into a cup, although it took multiple tries. (*Id.*). Claimant did not attempt to pick up a crayon, pull a string to obtain a rattle, or work on a puzzle. (*Id.*). He tried but failed to open a board book, was able to remove three pegs from a pegboard, and was unable to clap his hands. (*Id.*). Claimant

achieved a fine motor quotient score of 58 on the PDMS-2 test, demonstrating "skills that fall 3.0 standard deviations below the mean." (R. 194–95).

Ms. McGlaughlin also noted some difficulties Claimant was having with vision, hearing, and self-regulation. (R. 195). Overall, she opined that Claimant demonstrated "delays in the area of adaptive, fine motor[,] and sensory processing skills." (R. 196). He also presented "with delayed grasping patterns and visual motor skills," did not attend to "visual and auditory directions for completing fine motor tasks," and showed limited play skills. (*Id.*). Ms. McGlaughlin recommended that Claimant received occupational therapy support "to assist with improving his sensory processing, fine motor[,] and adaptive skills." (*Id.*).

### E.      ALJ's Decision Denying Benefits

ALJ Hoffman issued a decision dated July 30, 2019 in which, using the required three-step evaluation process to determine whether an individual under the age of 18 is disabled,[5] she determined that Claimant was not disabled under the Social Security Act. (R. 10–25). As a threshold matter, the ALJ found that Claimant was born in December 2016 and was therefore a "newborn/young infant" on the date the application for benefits was filed, and an "older infant" at the time of decision. (R. 13 (citing 20 C.F.R. § 416.926a(g)(2))).

At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since the application date. (*Id.*). At step two, the ALJ found that the Claimant had "the following

---

[5] Under the three-step analysis for evaluating disability claims by a minor child:

> First, the ALJ considers whether the child is engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). Second, the ALJ considers whether the child has a "medically determinable impairment that is severe," which is defined as an impairment that causes "more than minimal functional limitations." *Id.* § 416.924(c). Finally, if the ALJ finds a severe impairment, he or she must then consider whether the impairment "medically equals" or . . . "functionally equals" a disability listed in the regulatory "Listing of Impairments." *Id.* § 416.924(c)–(d).

*Miller v. Comm'r of Soc. Sec.*, 409 F. App'x 384, 386 (2d Cir. 2010) (summary order) (quoting *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004)).

severe impairments: Dandy-Walker malformation, corpus callosum dysgenesis, muscular ventricular septal defect, and congenital preauricular pit." (*Id.* at 13–14).

At step three, the ALJ first found that Claimant "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (R. 14–15).[6] In reaching this conclusion, the ALJ stated that she found Dr. Ganesh's May 24, 2019 consultative examination to be "persuasive," Ms. Kelsen and Mr. McNally's 2018 evaluations to have "some persuasive value," and Ms. McGlaughlin's and Ms. Campbell's May 2019 evaluations to have "some persuasive value." (*Id.*).

The ALJ next found that Claimant does not have an impairment or combination of impairments that "functionally equals" the severity of the listings. (R. 15). The ALJ considered all of the relevant evidence in the case record, evaluated the "whole child," and considered all symptoms when determining the "degree of limitation in each of the six functional equivalence domains." (*Id.*). The ALJ utilized a "two-step process" by which she first determined whether there is an "underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the claimant's pain or other symptoms," and then evaluated the "intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations." (*Id.*).

With regard to the six functional equivalence domains, the ALJ found that Claimant has a "less-than-marked" limitation in acquiring and using information, attending and completing tasks, moving about and manipulating objects, and health and physical well-being; and "no limitation" in interacting and relating with others and the ability to care for himself. (R. 18–25).

---

[6] Plaintiff does not challenge this finding, or the ALJ's findings at steps one and two.

In reaching these conclusions, the ALJ found Dr. Ganesh's May 24, 2019 opinion "persuasive." (R. 18). The ALJ noted that Dr. Ganesh's opinion was "based upon a direct examination of the claimant" and "supported by the findings that Dr. Ganesh made and included in her report." (*Id.*). The ALJ also considered Dr. Ganesh's "familiarity" with the disability program and the "fact that the purpose of her examination . . . was to render a medical opinion on disability." (*Id.*).[7] For each functional domain, after setting forth the relevant regulations describing the domain, the ALJ set forth a few observations from the record. (R. 18–25). The Court will address these observations as necessary in its analysis below.

Because functional equivalence, which would necessitate a finding of disability, is established by a finding of either an extreme limitation in one of the functional domains, or a marked limitation in any two of the functional domains, 20 C.F.R. § 416.926a(a), and the ALJ did not find a marked or extreme limitation in any of the domains, the ALJ concluded that Claimant "has not been disabled, as defined in the Social Security Act, since April 12, 2017, the date the application was filed." (R. 25 (citing 20 C.F.R. § 416.924(a))).

## III.   DISCUSSION

### A.   Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, made applicable to SSI cases by 42 U.S.C. § 1383(c)(3), the Court does not determine de novo whether Claimant is disabled. Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*,

---

[7] The record also contains an opinion by Dr. J. Randall, the State Agency review pediatrician, dated May 11, 2017, when Claimant was only almost five months old. (R. 74–80). The ALJ found this opinion to have "some persuasive value," finding it persuasive "to the extent her assessment is supported by the records that were available for her review." (R. 18).

569 F.3d 108, 112 (2d Cir. 2009). "Substantial evidence is 'more than a mere scintilla.' It means

such *relevant* evidence as a *reasonable* mind might accept as adequate to support a conclusion."

*Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (per curiam)

(quoting *Moran*, 569 F.3d at 112). The substantial evidence standard is "very deferential," and

the Court may reject the facts that the ALJ found "only if a reasonable factfinder would *have to*

*conclude otherwise*." *Id.* at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

The Court, however, must also determine whether the ALJ applied the correct legal standard.

*Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999). "'Where an error of law has been made that

might have affected the disposition of the case, this court cannot fulfill its statutory and

constitutional duty to review the decision of the administrative agency by simply deferring to the

factual findings of the ALJ.'" *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (quoting

*Wiggins v. Schweiker*, 679 F.2d 1387, 1389 n.3 (11th Cir. 1982)). The Court reviews de novo

whether the correct legal principles were applied and whether the legal conclusions made by the

ALJ were based on those principles. *See id.*; *see also Johnson v. Bowen,* 817 F.2d 983, 985 (2d

Cir. 1987).

## B.    Analysis

Plaintiff argues that the ALJ "failed to consider the results of standardized test scores

which indicated extreme limitations in two domains of functioning as well as a marked limitation

in one domain of functioning," which would support a finding that Claimant's impairments

functionally equal a listing. (Dkt. No. 13, at 13–27). Specifically, Plaintiff argues that the

standardized test scores in the record, together with the consistency of those scores with

Claimant's day-to-day functioning, support a finding of extreme limitations in the domains of

moving about and manipulating objects and acquiring and using information, and a finding of a

marked limitation in the domain of caring for oneself. (*Id.*). Plaintiff argues that (1) the ALJ

failed to discuss the relevant standardized testing and failed to provide an explanation for "why she ultimately disregarded this evidence," (2) the ALJ did not explain why Ms. McGlaughlin's and Ms. Campbell's May 2019 evaluations had only "some persuasive value," and (3) the ALJ's reliance on Dr. Ganesh's May 2019 consultative opinion, which she found "persuasive," was "misguided." (*Id.* at 24–26). Defendant generally responds that substantial evidence in the record as a whole supports the ALJ's findings that Claimant's impairments do not functionally equal a listed impairment. (*See generally* Dkt. No. 18).

Before turning to Plaintiff's arguments about specific functional domains, the Court addresses certain general principles relating to consideration of standardized testing in determining functional equivalence. Social Security regulations provide that a claimant's impairments are of "listing-level severity" if those impairments "result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a). As relevant here, the Commissioner "will find" that a claimant has a "marked" limitation in one of the six functional domains when the claimant has "a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and [the claimant's] day-to-day functioning in domain-related activities is consistent with that score." *Id.* § 416.926a(e)(2)(iii). The regulations direct a finding of an "extreme" limitation when the claimant has "a valid score that is three standard deviations or more below the mean on a comprehensive standardized test designed to measure ability or functioning" in the domain, and the claimant's day-to-day functioning is consistent with that score. *Id.* § 416.926a(e)(3)(iii).[8]

---

[8] Neither party argues that any of the relevant standardized testing in the record is not a "comprehensive standardized test designed to measure ability or functioning" in the corresponding domain.

Thus, valid test scores falling below two or three standard deviations do not necessarily compel a finding of disability. *See Miles ex rel. J.M. v. Astrue*, 502 F. App'x 59, 61 (2d Cir. 2012) (summary order) (noting that "the regulation does not compel a finding of disability based on one standardized test" and that the claimant must also demonstrate that his day-to-day functioning is consistent with that score); *Juarez ex rel. R.R.O. v. Saul*, 800 F. App'x 63, 64–65 (2d Cir. 2020) (summary order) (rejecting the argument that standardized test scores established a marked limitation "as a matter of law"). However, a finding of an extreme or marked limitation is directed by the regulations where the relevant test score is consistent with the claimant's day-to-day functioning in domain-related activities. *See, e.g.*, *F.M. v. Astrue*, No. 08-cv-4430, 2009 WL 2242134, at *8, 2009 U.S. Dist. LEXIS 64258, at *26–27 (E.D.N.Y. July 27, 2009) ("Because B.M.'s 'day-to-day functioning in domain-related activities is consistent with' his score of two standard deviations below the mean, the regulations direct a finding that B.M. has a marked limitation." (quoting 20 C.F.R. § 416.926a(e)(2))). The regulations further direct that "when the ALJ chooses not to rely on test scores at or below two standard deviations of the mean, he must 'explain [the] reasons for doing so.'" *Garcia v. Colvin*, No. 12-cv-5886, 2015 WL 7758533, at *9, 2015 U.S. Dist. LEXIS 161312, at *27 (S.D.N.Y. Dec. 1, 2015) (quoting 20 C.F.R. § 416.926a(e)(4)(iii)(B)).

Here, as set forth in greater detail below, the Court concludes that the ALJ did not adequately discuss Claimant's standardized test scores in the three functional domains Plaintiff challenges, why she did not rely on those scores, and/or why she found them inconsistent with Claimant's day-to-day functioning. Because the ALJ did not adequately explain her reasoning, and because the Court cannot conclude that her failure to adequately address Claimant's test scores was harmless, remand is warranted.

### 1.    Moving About and Manipulating Objects

Plaintiff first argues that the ALJ erred in finding that Claimant has a less-than-marked limitation in the functional domain of moving about and manipulating objects because the evidence establishes Claimant received a standardized test score more than three standard deviations below the mean and his daily functioning is consistent with that score. (Dkt. No. 13, at 15–19). Defendant responds that the "record as a whole" supports the ALJ's assessment, arguing that the ALJ "acknowledged" Claimant's test results but noted "other evidence in the record that supported a less than marked limitation." (Dkt. No. 18, at 8–12).

The "moving about and manipulating objects" domain considers how a claimant moves his body "from one place to another" and how the claimant "move[s] and manipulate[s] things." 20 C.F.R. § 416.926a(j) ("These are called gross and fine motor skills."). The regulations state that "Older infants and toddlers (age 1 to attainment of age 3)," which is the age the Claimant was during most of the relevant time period, "should begin to explore actively a wide area of [the] physical environment, using [their] bod[ies] with steadily increasing control and independence from others." *Id.* § 416.926a(j)(2)(ii).

The record reflects the following standardized test scores relating to this domain. At the April 2018 evaluation performed by Ms. Kelsen and Mr. McNally, when Claimant was 15 months old, he received a motor composite score of 58 on the BSID-III Motor Scale, more than two standard deviations below the mean. (R. 360). At the September 2018 evaluation, when Claimant was 20 months old, he achieved a motor composite score of 61 on the same test, a score which is also more than two standard deviations below the mean. (R. 354). And, at the May 2019 occupational therapy evaluation performed by Ms. McGlaughlin, Claimant "achieved a motor quotient of 58 in the fine motor domain" of the PDMS-2 test. (R. 194–95). Ms.

McGlaughlin noted that Claimant "demonstrate[d] skills that fall 3.0 standard deviations below the mean." (R. 195).

In explaining her determination that Claimant has a less-than-marked limitation in moving about and manipulating objects, the ALJ noted that (1) Claimant demonstrated "below-average" gross and fine motor skills at the April and September 2018 evaluations; (2) Dr. Ganesh assessed Claimant's gross motor skills as "normal" for his age and his fine motor activity and strength and fisting of his hands as "age-appropriate"; and (3) Claimant demonstrated "fine motor skills that fell 3.0 standard deviations below the mean" after testing at the May 2019 evaluation. (R. 23). The ALJ does not explain how these three observations lead to a finding that Claimant has a less-than-marked limitation in this functional domain. The ALJ does not acknowledge that the standardized test scores from the two 2018 evaluations were both more than two standard deviations below the mean, instead describing them as simply "below-average." (*Id.*; *see also* R. 16). Nor does she explain why she discounted Claimant's May 2019 score falling three standard deviations below the mean. Without such an explanation, the Court concludes that the ALJ did not adequately address the standardized test scores relating to this functional domain or adequately explain why she did not rely on those scores, as required by the regulations. *Cf. Royster ex rel. J.R.R. v. Comm'r of Soc. Sec.*, No. 19-cv-1250, 2020 WL 7640934, at *5, 2020 U.S. Dist. LEXIS 241977, at *16 (W.D.N.Y. Dec. 23, 2020) ("Although this Court must accept the ALJ's reasonable interpretation of evidence, the ALJ has not provided any explanation suggesting how a reasonable fact-finder could interpret this opinion as supportive of a less than marked, rather than marked, limitation in the domain of interacting and relating with others, particularly when read with standardized testing of more than two standard deviations below the mean . . . ."); *Garcia*, 2015 WL 7758533, at *9, 2015 U.S. Dist. LEXIS

161312, at *26–27 (finding that the ALJ did not "adequately address" standardized test scores where, although the ALJ the recognized that the claimant's skills were evaluated to be more than three standard deviations below expectations on those tests, he "nevertheless found" that the claimant had less marked restrictions in the domain "without any discussion of his reasoning for discounting the [] test results"); *see also Hickman ex rel. M.A.H. v. Astrue*, 728 F. Supp. 2d 168, 173 (N.D.N.Y. 2010) ("The ALJ must build an accurate and logical bridge from the evidence to [her] conclusion to enable a meaningful review." (citation and internal quotation marks omitted)).

Nor did the ALJ adequately explain how Claimant's day-to-day functioning in activities relating to this domain was inconsistent with the test scores. The ALJ relies on Dr. Ganesh's May 24, 2019 assessment of Claimant in which Dr. Ganesh found that Claimant's gross motor skills and fine motor activity of his hands were "age-appropriate." (R. 23 (citing R. 370–71)).[9] However, the ALJ does not explain how Dr. Ganesh's assessment, which was based on a single "direct examination," (R. 18), speaks to Claimant's day-to-day functioning and its consistency or inconsistency with the standardized test scores. Nor is a sufficient explanation found in the remainder of the ALJ's decision, which recounts, as potentially supporting the ALJ's determination regarding this domain, that a pediatrician noted that Claimant was "developing appropriately" at 2.5 months, that Claimant reportedly does not "have any hearing or vision loss," that he "played with cars" and other toys, and that he was able to walk and run by two years of age. (R. 16).

---

[9] The ALJ elsewhere stated that she found Dr. Ganesh's opinion "persuasive." (R. 14, 18). Defendant does not respond to Plaintiff's argument that the ALJ's reliance on Dr. Ganesh's opinion was "misguided" or the argument that the ALJ did not "elaborate" as to why the other evaluations in the record had only "some persuasive value." (*See* Dkt. No. 13, at 25–26). The Court does not need to reach these arguments.

Because there is evidence in the record to support a finding that Claimant's day-to-day

functioning is consistent with the standardized test scores relating to moving about and

manipulating objects, including as recounted elsewhere in the ALJ's decision, (*e.g.*, R. 16 (citing

R. 279–81 (noting that Claimant "walked delayed at 20 months and could not run" and

demonstrated joint laxity, hypotonia, and hypotonic gait)), R. 17 (citing R. 275 (noting that

Claimant could not scribble or walk up and down steps))), the Court is unable to conclude that

the ALJ's failure to adequately address those test scores is harmless. Had the ALJ properly

considered the standardized test scores, it is possible that she would have found Claimant to have

an extreme or marked limitation in the functional domain of moving about and manipulating

objects.

### 2.      Acquiring and Using Information

Plaintiff also argues that the ALJ erred in finding that Claimant has a less-than-marked

limitation in the functional domain of acquiring and using information because she failed to

consider the relevant standardized test scores Claimant received falling more than three standard

deviations below the mean. (Dkt. No. 13, at 19–22). Defendant responds that the ALJ

"recognized" Claimant's below-average performance at his evaluations and that the evidence is

"collectively" adequate to support her finding of a less-than-marked limitation in this domain.

(Dkt. No. 18, at 12–15).

The "acquiring and using information" functional domain considers how well the

claimant acquires or learns information and how well the claimant "use[s] the information" he

has learned. 20 C.F.R. § 416.926a(g). Older infants and toddlers are "learning about the world

around" them and should "understand that words represent things," refer to things around them

"by pointing and eventually by naming," and engage in "purposeful experimentation . . . ,

imitation, constructive play . . . , and pretend play activities." *Id.* § 416.926a(g)(2)(ii). Older

infants and toddlers "should begin to respond to increasingly complex instructions and questions, and to produce an increasing number of words and grammatically correct simple sentences and questions." *Id.*

The record reflects the following standardized test scores relating to this domain. At the April 2018 evaluation, Claimant received a total language score of 87 on the DAYC-2 test. (R. 358). Claimant also received a score of 80 on the BSID-III cognitive development subtest. (*Id.*). Both of these scores are slightly below average. (*Id.*). At the September 2018 evaluation, Claimant received a total language score of 79 on the DAYC-2 test, below average, and a score of 70 on the BSID-III cognitive development subtest, two standard deviations below the mean. (R. 352). At the May 30, 2019 evaluation, Claimant was tested on the PLS-5 standardized test. (R. 189–90). He received a score of 50 on the receptive language skills subtest and a score of 54 on the expressive language subtest. (*Id.*). Overall, he received a total language standard score of 50, corresponding to a "significant" communication delay and falling "3.3 standard deviations below the mean for [his] age group." (R. 190).

To explain her determination that Claimant has a less-than-marked limitation in acquiring and using information, the ALJ noted that (1) Claimant's overall cognitive skills were assessed as being slightly below average and below average at the April and September 2018 evaluations, respectively; (2) his communication skills were slightly below average and below average at the two evaluations; and (3) Claimant was "found to be demonstrating below-average receptive and expressive communication skills" and was recommended for speech therapy services at the May 30, 2019 evaluation. (R. 19–20). The ALJ does not explain how her observations lead to a finding that Claimant as a less-than-marked limitation in this functional domain. While not all of Claimant's standardized test scores relating to this domain fall at least two standard deviations

below the mean, the ALJ nowhere acknowledges that Claimant's September 2018 cognitive development score was two standard deviations below the mean or that his total language score in May 2019 was 3.3 standard deviations below the mean. She does not explain why she discounted these scores, and, without such an explanation, the Court concludes that the ALJ committed legal error by not adequately addressing the standardized test scores. *Cf. Afriyie ex rel. D.K.B. v. Saul*, No. 19-cv-4635, 2020 WL 5416570, at *11, 2020 U.S. Dist. LEXIS 165654, at *30 (S.D.N.Y. Sept. 10, 2020) (holding that the ALJ committed legal error by disregarding the import of the claimant's standardized test scores and noting that "an ALJ's failure to acknowledge relevant evidence or to explain its implicit rejection is plain error" (citations omitted)); *Royster*, 2020 WL 7640934, at *5, 2020 U.S. Dist. LEXIS 241977, at *16; *Garcia*, 2015 WL 7758533, at *9, 2015 U.S. Dist. LEXIS 161312, at *26–27.

Nor does the ALJ adequately explain how the Claimant's day-to-day functioning in activities relating to acquiring and using information was inconsistent with the test scores. Indeed, much of the evidence cited elsewhere in her opinion appears to be consistent with the test results. (*E.g.*, R. 16 (citing R. 279 (noting at 23 months that Claimant had a "speech delay" and "did not put two words together")), 16–17 (citing R. 274–75 (noting at 24 months that Claimant "had about five words, but did not put two words together," that he could not name one picture, and that he could not follow two-step commands without gestures)), R. 17 (citing R. 372 (Dr. Ganesh's evaluation noting that Claimant's speech at 29 months was "just monosyllables and single words"))). Because there is evidence in the record to support a finding that Claimant's day-to-day functioning is consistent with the standardized test scores, the Court is unable to conclude that the ALJ's failure to adequately address those test scores is harmless. Proper consideration of the standardized test scores could lead to a finding that the Claimant has an

extreme or marked limitation in the functional domain of moving about and manipulating objects.

As noted above, if Claimant's impairments result in marked limitations in any two domains of functioning or an extreme limitation in one domain, his impairments functionally equal a listed impairment and a finding of disability would be warranted. Proper consideration of the standardized test scores in the record could lead to a finding that Claimant has a marked limitation in the two domains of moving about and manipulating objects and acquiring and using information, or an extreme limitation in either domain. A finding of disability would be warranted in either case, and remand is therefore required. The Court therefore does not reach Plaintiff's remaining arguments.

## IV.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that the decision of the Commissioner is **REVERSED**, and this action is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Decision and Order; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Dated: <u>August 2, 2022</u>
       Syracuse, New York

Brenda K. Sannes
U.S. District Judge